IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

---

MICHAEL JAMES COLUCCIO,

Petitioner,

vs.

STATE OF MONTANA; ATTORNEY GENERAL OF THE STATE OF MONTANA,

Respondents.

Cause No. CV 10-64-M-JCL

AMENDED
ORDER DISMISSING PETITION AND GRANTING CERTIFICATE OF APPEALABILITY IN PART

---

On June 7, 2010, Petitioner Michael James Coluccio filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254. Coluccio is a state prisoner. At the time his petition was filed, he was proceeding pro se.

On July 16, 2010, in response to an Order, Respondents ("the State") filed the trial transcript. Following preliminary screening of the Petition in light of the transcript, Rule 4, Rules Governing § 2254 Cases, counsel was appointed to represent Coluccio, and an Amended Petition was filed on October 25, 2010. The State filed

an Answer and a motion to dismiss on December 16, 2010. The motion to dismiss was fully briefed on January 21, 2011.

Based on the parties' written consent to magistrate judge jurisdiction, the matter was reassigned to the undersigned on January 26, 2011. Clerk's Notice (doc. 25); Consents (doc. 25-1).

## I. Overview

Johnsrud Park, off Highway 200 in Missoula County, Montana, is a popular location for rafters and floaters to park and launch into the cool Blackfoot River on hot summer days. July 14, 2007, was a Saturday. The temperature was right around 100 degrees.

On that day, at about 4:35 p.m., Petitioner Coluccio was driving east in a Chevrolet Suburban when he turned left into Johnsrud Park in front of a motorcyclist, John Troyer, in the westbound lane. Troyer was killed in the collision. Coluccio was charged with a felony, vehicular homicide while under the influence, a violation of Mont. Code Ann. § 45-5-106(1) (2007), and two misdemeanors. He pled guilty to the misdemeanors and went to trial on the vehicular homicide charge.

Under Montana law, "[a] person commits the offense of negligent homicide if the person negligently causes the death of another human being." Mont. Code Ann. § 45-5-104. The maximum penalty for negligent homicide is twenty years in prison.

Id. § -104(3). Vehicular homicide while under the influence carries a maximum penalty of thirty years and is committed if the defendant "negligently causes the death of another human being while the person is operating a vehicle in violation of 61-8-401." Mont. Code Ann. § 45-5-106(1), (3).

Section 61-8-401 of the Montana Code defines the offense of driving under the influence of alcohol or drugs.[1] It is an "absolute liability" offense and is proven if "a person's ability to safely operate a vehicle is diminished," to any extent, by alcohol or drugs. Id. § 61-8-401(3)(a), (7). "In order to be convicted of negligent vehicular homicide, a defendant must be found to be *both* under the influence *and* criminally negligent." State v. Coluccio, 214 P.3d 1282, 1286 ¶ 18 (Mont. 2009) (emphases added); see also State v. Condo, 182 P.3d 57, 60-61 ¶¶ 15-17 (Mont. 2008). Criminal negligence is defined as follows:

> A person acts negligently *with respect to a result or to a circumstance described by a statute defining an offense* when the person consciously disregards a risk that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that *the result will occur* or that *the circumstance exists*. The risk must be of a nature and degree that to disregard it involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care.

[1] Mont. Code Ann. § 61-8-406, driving with an excessive blood alcohol concentration, is also a predicate offense of vehicular homicide. Coluccio was charged only under § 401.

Mont. Code Ann. § 45-2-101(43) (emphases added).

At trial, Coluccio admitted he drank before he drove on July 14 and failed to yield to Troyer. He disputed the amount the State claimed he drank and contested the State's theory that he was under the influence. He also asserted that he simply did not see Troyer before turning into Johnsrud Park. He testified on his own behalf.

If persuaded to draw inferences in Coluccio's favor, a reasonable juror could have found that, although Coluccio's ability to drive was diminished, he did not drink so much that his decision to drive was a gross deviation from the standard of care a reasonable person would observe.[2] A reasonable juror could have believed that Coluccio would not have turned in front of Troyer if he had seen him. A juror who found these facts could have found that Coluccio met the elements of DUI, and caused Troyer's death, without finding that Coluccio was criminally negligent.

The trial court's instructions defined negligence as follows:

> In a criminal case, a person acts negligently when an act is done with conscious disregard of the risk, or when the person should be aware of the risk *by driving a motor vehicle after consuming alcohol* and *failing to yield the right of way to oncoming traffic* . . . .

Trial Tr. (doc. 6-1) at 446:5-10 (emphasis added).

---

[2] A reasonable juror's common sense might tell him or her that many, many people, over the course of a Montana summer, consume three or four light beers over a two- or three-hour period before driving to Johnsrud Park to float the river. Cf. Fed. R. Evid. 201(b)(1).

The jury found Coluccio guilty. He was sentenced to serve 30 years in prison, with 15 years suspended. Am. Pet. (doc. 14) at 2 ¶ 5. On direct appeal, he challenged the trial court's instruction defining negligence and the sufficiency of the evidence to support findings of DUI and criminal negligence. The Montana Supreme Court rejected his arguments and affirmed the conviction. Coluccio, 214 P.3d at 1290 ¶ 46.

In this Court, Coluccio asserts that the jury's instruction on negligence vitiated his defense and essentially directed a verdict on this "core" element, Am. Pet. at 4-5; and that the evidence was not sufficient to support a finding either that his drinking impaired his ability to operate a motor vehicle or that he was criminally negligent, id. at 5-9, both in violation of his federal rights to due process and a fair trial under the Fourteenth Amendment of the United States Constitution, id. at 4; 28 U.S.C. § 2254(a).

**II. Procedural Default**

The State contends that Coluccio's claims were not properly exhausted in the state courts and so are procedurally defaulted. Br. in Supp. of Mot. to Dismiss (doc. 18) at 8. Coluccio responds that his claims are exhausted because Montana law on the issues of burden of proof and sufficiency of the evidence is identical to the federal law. Resp. to Mot. (doc. 23) at 6-8.

Before a federal court may entertain a state prisoner's petition for writ of habeas

corpus, the prisoner must exhaust available state judicial remedies with respect to each claim he raises in federal court. 28 U.S.C. § 2254(b)(1)(A), (c); Rose v. Lundy, 455 U.S. 509, 522 (1982). The exhaustion doctrine protects the role of state courts in the development of federal law and minimizes federal court intervention in state criminal proceedings. O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999); see also Sarei v. Rio Tinto, PLC, 550 F.3d 822, 828-29 (9th Cir. 2008) (en banc) (describing all federal common-law exhaustion doctrines as originating in habeas corpus to prevent "unnecessary conflict between federal [courts] and state courts" or other tribunals) (quoting Ex parte Royall, 117 U.S. 241, 251 (1886) (internal brackets omitted)).

To "protect the integrity of the federal exhaustion rule," federal courts "ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts." Boerckel, 526 U.S. at 848 (emphasis in original). To meet this "fair presentation" requirement, a petitioner must:

(i) use the "remedies available," § 2254(b)(1)(A), through the state's established procedures for appellate review, Boerckel, 526 U.S. at 845;

(ii) describe "the federal legal theory on which his claim is based," Davis v. Silva, 511 F.3d 1005, 1009 (9th Cir. 2008); and

(iii) describe "the operative facts . . . necessary to give application to the constitutional principle upon which the petitioner relies," id.

See also Gray v. Netherland, 518 U.S. 152, 162-63 (1996) (discussing Picard v.

Connor, 404 U.S. 270 (1971), and Anderson v. Harless, 459 U.S. 4 (1982)).

On direct appeal, Coluccio met the first and the third prongs. The question is whether he met the second. "A litigant . . . can easily indicate the federal law basis for his claim . . . by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Baldwin v. Reese, 541 U.S. 27, 32 (2004). "[F]or purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue," Peterson v. Lampert, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc), provided the citation is "accompanied by some clear indication that the case involves federal issues," Casey v. Moore, 386 F.3d 896, 912 n.13 (9th Cir. 2004) (discussing Reese, 541 U.S. at 32); see also, e.g., Caswell v. Calderon, 363 F.3d 832, 838 (9th Cir. 2004) (petitioner "alerted the state courts to the federal nature of his invocation with several citations to . . . a California case analyzing the federal Due Process Clause.").

"If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." Johnson v. Zenon, 88 F.3d 828, 830 (9th Cir. 1996) (holding Tamapua v. Shimoda, 796 F.2d 261, 262-63 (9th Cir. 1986), abrogated by Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam)). "[G]eneral appeals to

broad constitutional principles, such as due process, equal protection, and the right to a fair trial," do not establish exhaustion. Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999) (citation omitted); see also Shumway v. Payne, 223 F.3d 982, 987 (9th Cir. 2000). And it is not sufficient that the federal basis is "self-evident." *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), as modified by 247 F.3d 904 (9th Cir. 2001). "In short, the petitioner must have either referenced specific provisions of the federal constitution or cited to federal or state cases involving the legal standard for a federal constitutional violation." Castillo v. McFadden, 399 F.3d 993, 999 (9th Cir. 2005).

Coluccio's opening brief on direct appeal argued that the trial court's instruction defining negligence "prejudiced Coluccio by reducing the State's burden of proof and by taking determination of criminal negligence – the core factual issue of his defense – away from the jury." Answer Ex. B (doc. 16-1) at 20; see also id. at 14 ("reduced the State's burden of proof by taking determination of whether his conduct rose to the level of criminal negligence away from the jury."). The brief did not cite the federal Constitution or any federal cases. It cited and discussed several state cases, but they do not mention, much less rely on, federal law relevant to Coluccio's claims. Id. at 4-7, 16-27. The reply brief, Answer Ex. D, focused solely on the issue of restitution, which is not pertinent here. As a result, the Montana

Supreme Court simply was not apprised that the errors of which Coluccio complained were "not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment." Henry, 513 U.S. at 366.

Coluccio is correct that recent decisions of the Supreme Court have "left open the question whether the invocation of a state constitutional provision is adequate to raise a federal claim under the corresponding federal constitutional clause when the state courts treat both claims in an identical manner." Resp. to Mot. at 6. He cites State v. McCaslin, 96 P.3d 722, 727 ¶ 24 (Mont. 2004), to show that Montana follows In re Winship, 397 U.S. 258, 264 (1970), and Sandstrom v. Montana, 442 U.S. 510, 524 (1979). He also cites the State's brief in support of its Answer to show that the Montana test and the federal test for the sufficiency of the evidence are identical, Resp. to Mot. at 7-8 (citing Br. in Supp. at 20 (citing Jackson v. Virginia, 443 U.S. 307, 324 (1979))).

But Coluccio did not cite any state constitutional provision, let alone McCaslin. He did not cite a state case analyzing and applying a state constitutional provision that was pertinent to his case.[3] He did not use the phrase "due process" in connection with

---

[3] Coluccio cited State v. Gould, 704 P.2d 20 (Mont. 1985), see State Ex. B at 21. Gould considered whether Montana's definition of criminal negligence was unconstitutionally vague. 704 P.2d at 33 ("adopt[ing] the view of the United States Supreme Court" in United States v. Ragen, 314 U.S. 513, 523 (1942), that "[t]he mere fact that a penal statute is so framed as to require a jury upon occasion to determine

the issues he presents here. He did not even use the word "constitution." He gave the Montana Supreme Court even less guidance than the petitioners in Fields v. Waddington, 401 F.3d 1018, 1021-23 (9th Cir. 2005), and Casey, 386 F.3d at 911-12, cited in Resp. to Mot. at 6, gave their state courts. On the issues presented here, Coluccio's brief on direct appeal does not invoke any constitutional rights, state or federal. Even assuming that McCaslin "demonstrate[s] that the [Montana] courts would treat [Coluccio's] state . . . claims identically to the federal claims he now asserts," Casey, 386 F.3d at 914, Coluccio did not cite McCaslin or any state case like it.

Under the circumstances here, it would not serve the interests of comity for this Court to contemplate holding that the Montana Supreme Court unreasonably applied federal law. Even state law purporting to apply federal law may vary considerably from it as time passes. See, e.g., City of Billings v. Bruce, 965 P.2d 866, 870-78 ¶¶ 17-58 (Mont. 1998) (applying Barker v. Wingo, 407 U.S. 514 (1972)), overruled by

a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct."). But Coluccio did not claim the statute was vague, only that the trial court's instruction misstated it. He also cited State v. Lundblade, 625 P.2d 545, 549 (Mont. 1981), State Ex. B at 22, which cited Sandstrom because the trial court had given the same instruction the United States Supreme Court ruled unconstitutional in Sandstrom: "we urge the District Court to avoid this instruction in a retrial of this case." 625 P.2d at 549. Gould and Lundblade do not raise the same issues Coluccio did. A few other state cases Coluccio cited analyzed federal law, but on entirely separate issues such as double jeopardy or the Fourth Amendment.

State v. Ariegwe, 167 P.3d 815, 828 ¶ 27 (Mont. 2007) ("we recognize, for the reasons which follow, that our method of analysis has strayed considerably from the actual balancing approach envisioned in Barker and that it is necessary to reexamine certain features of our existing analytical framework."). It is not unreasonable to expect a litigant to assert a federal right when that is what he means to claim. Nor, as Reese points out, 541 U.S. at 32, is it difficult. Lawyers and pro se litigants alike do it all the time. Under the rule Coluccio proposes, it is difficult to imagine why state prisoners would ever be required to describe a federal legal theory. After all, federal constitutional law establishes minimal safeguards that must be provided in every state criminal proceeding, and those are the only rights that can be vindicated in federal habeas.

Because Coluccio did not describe the federal legal theory underlying his claims in the Montana Supreme Court, his claims are procedurally defaulted. He offers no cause to excuse his default. Smith v. Baldwin, 510 F.3d 1127, 1146 (9th Cir. 2007) (en banc). The only remaining question is whether a jury instructed without the trial court's alleged error could have found sufficient evidence to convict him, or whether the constitutional violation he alleges "probably . . . caused the conviction of one innocent of the crime." Id. at 1139 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)).

**III. Sufficiency of the Evidence**

To prevail on the merits of the second claim in his petition, Coluccio must show that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); see also In re Winship, 397 U.S. 358, 364 (1970). Similarly, to excuse his procedural default, he must show that, "in light of all the evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." Smith, 510 F.3d at 1140 (citing Schlup v. Delo, 513 U.S. 298, 327 (1995), and House v. Bell, 547 U.S. 518, 537-37 (2006)). On federal habeas review, the Jackson standard is applied with "an additional layer of deference," Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing 28 U.S.C. § 2254(d)), if the Montana Supreme Court considered and upheld the sufficiency of the evidence. It did. State v. Coluccio, 214 P.3d 1282, 1288 ¶¶ 29-30 (Mont. 2009). Nonetheless, to address both the merits of Coluccio's second claim and the issue of excuse for procedural default, the sufficiency of the evidence is here reviewed de novo, as if the Montana Supreme Court had not considered the issue, and under the Schlup standard.

On a clear, sunny day, Coluccio turned his Suburban directly into the path of a bright yellow motorcycle with lots of chrome and its headlight on at high beam. Trial Tr. at 137:10-13, 167:25-168:3, 278:1-16. There was no evidence that Troyer,

the weather, shadows, sun glare, wind, mechanical defect of either vehicle, the condition or construction of the road, objects or animals on the road, other vehicles or drivers, pedestrians, or any of Coluccio's passengers contributed in any way to the collision. There was a vehicle behind Coluccio and one at the intersection waiting for Troyer and the vehicles behind him to pass before turning on to Highway 200 west. Both of those drivers and the passenger in the waiting vehicle saw Troyer coming. Id. at 136:20-21, 167:2-7, 179:13-17. Coluccio was traveling at a speed somewhere between a "dead stop"[4] and ten miles per hour. Id. at 148:5-14, 415:18-416:12. He did not suggest he was distracted or inattentive. He said he simply did not see Troyer, id. at 395:5-17, though he saw the vehicles behind Troyer, id. at 416:1-3. Troyer covered the 306 yards from the curve at or below the speed limit. Id. at 168:9-12, 196:17-197:11, 198:13-24, 356:2-8. Coluccio had more than eight full seconds to see and respond to Troyer's motorcycle. Id. at 357:22-25.

An expert witness testified that alcohol:

> increase[s] the amount of time it takes us to do what's called divided attention tasks, which is to recognize the danger, perceive a situation, process – cognitively process that, and then form an opinion in our mind about what we need to do and then react to that stimulus and either

---

[4] In his tape-recorded statement after the accident, Coluccio twice said he came to a "dead stop." At trial, he testified that it was "almost a complete stop." Trial Tr. at 416:1. The driver behind Coluccio said he was probably moving at five to ten miles per hour. Id. at 135:12-15, 148:5-14.

brake, swerve, accelerate, or whatever to avoid a particular situation.

Trial Tr. at 298:18-24. Other effects include "tunnel vision," "depth perception issues," and "narrowing of our visual acuity." Id. at 298:13-299:3.

These facts were uncontested. From this evidence, a reasonable juror could infer that even a distracted or inattentive driver would have had enough time to see and respond to Troyer, but a driver who had been drinking would be less likely to see him and accurately assess his speed and position on the road, would take more time to assess the situation and decide how to respond, and would have a less accurate perception of his own response, such as the speed and position on the road of his own vehicle.

The accident occurred at 4:39 p.m. Trial Tr. at 210:3-5. At 6:23 p.m., Coluccio, having had no alcohol for at least two hours, had a BAC of .07.[5] Id. at 231:10-232:1, 287:21-23, 414:18-23. After the accident, Coluccio told a state trooper

[5] The State was not required to prove a particular blood-alcohol concentration ("BAC"). Under Montana law, if a person's BAC was 0.04 or less, the jury may infer that he was not under the influence. If the BAC was 0.08 or more, the jury may infer that he was under the influence. If the BAC was between 0.04 and 0.08, the jury may not draw an inference based solely on the BAC, but it may consider the BAC with other evidence to determine whether the person was under the influence. Mont. Code Ann. § 61-8-401(4). Regardless of BAC evidence, the jury may consider any other competent evidence to determine whether the defendant's ability to operate the vehicle safely was diminished by alcohol. Id. § 401(5). Thus, even a person with a .02 BAC, for instance, could be convicted of vehicular homicide, given other credible evidence of impairment by alcohol and of criminal negligence.

that he drank three light beers[6] between 1:00 and 3:00. Id. at 391:17-18, 413:22-24, 418:11-17. Someone who stopped drinking at about 3:00 and had a BAC of .07 at 6:23 would have had a peak BAC between .09 and .135, depending on individual physiology, at some point between 3:30 to 4:30 p.m. Id. at 292:5-10, 296:19-297:13. A peak BAC of .095 would occur in a 150-pound man who consumed seven light beers in a three-hour period. Id. at 315:8-316:2. Coluccio weighed 180-190 pounds, id. at 291:12-13,[7] and so would have to drink either more or in less time to reach a level of .095. After the State's BAC expert testified, Coluccio testified that he stopped drinking a little after 4:00. Id. at 418:24-419:1.

Two highway patrol officers testified they could smell alcohol on Coluccio at the scene of the accident, and both thought he looked like he had been drinking. Trial Tr. at 224:15-22, 350:4-351:13. Witnesses thought it was strange that Coluccio was standing barefooted on very hot pavement when a patch of grass was right next to him. Id. at 245:20-22, 350:16-351:3. He was described as "dancing" and "swaying." Id. at 160:13-162:4, 189:6-190:4. Two other witnesses who saw him at the scene did not smell alcohol on his breath or see behavior typical of intoxication, but they said

---

[6] Light beer has about 80% of the alcohol content of a regular beer. Trial Tr. at 313:3-6.

[7] This was phrased as an assumption, but the record does not suggest it was an unreasonable one.

Coluccio seemed "not right" or was "kind of stomping around." Id. at 172:6-173:11, 202:16-203:25. Coluccio himself acknowledged what the jury knew as a matter of common sense: that some effects of alcohol cannot be seen and different people exhibit symptoms of intoxication differently. Id. at 401:15-403:18.

At trial, Coluccio maintained he "started early" in the afternoon, id. at 419:25-420:3, 391:17-18, had three beers, or "[m]ight have been, you know, maybe one more," id. at 414:4-6, and had his last drink and left his house a little after 4:00, id. at 393:5-10, 419:25-420:3, 416:18.

Coluccio concluded his testimony in cross-examination:

Q. Would you agree that had you not gotten behind the wheel, this collision would have been avoided?

A. I don't see how that would have made a bit of difference.

Q. And Mr. Troyer's life may have been saved?

A. Just because I wasn't behind the wheel?

Trial Tr. at 422:11-16. The jury was entitled to consider this testimony in weighing Coluccio's credibility as a witness.

Coluccio's theory was that his BAC was at its peak at 6:23, and he was not impaired at the time of the accident. But there was no evidence to support the proposition that a 180-pound man who drinks three or four light beers would *ever* reach a BAC of .07, even if he drinks all of them in one hour, much less that his BAC

would be at .07 more than two hours after he stops drinking.[8] A reasonable juror would, more likely than not, decide that one had to reject either the BAC level itself and/or the expert testimony about BAC levels or the notion that Coluccio had only three or four light beers.

Based on all the evidence, including Coluccio's attitude on the stand, it was reasonable for a juror to infer that Coluccio did not tell the truth about how much he drank, either because he knew it was significantly more than three or four light beers and feared the jury would be displeased to hear the true amount, or because he was so careless that he paid no attention to how much he had and he thought three or four would be a safe amount to say he had. A reasonable juror who did not believe what Coluccio said could conclude, beyond the point where there was any reason to doubt the conclusion, that Coluccio's ability to see and respond to Troyer was diminished because he drank too much to be able to drive safely. The same juror could conclude, again beyond a reasonable doubt, that, based on his .07 BAC at 6:23 p.m., Coluccio grossly deviated from the standard of care a reasonable person would observe when he chose, at a little after 4:00, to disregard the significant amount of alcohol he had consumed and drive up to Johnsrud Park. This juror would not have had to find that Coluccio was criminally negligent because he failed to yield or because he drank

[8] There may be evidence that this is possible, but it was not introduced at trial.

before he drove; his finding could rest, instead, on Coluccio's lack of attention and forethought in light of the amount of alcohol he must have had to drink before he decided to drive. Although a reasonable juror could have acquitted Coluccio, conviction was at least equally likely.

Coluccio cannot show it is "more likely than not that no reasonable juror would convict him of the relevant crime." Smith, 510 F.3d at 1140. Both claims in his petition must be dismissed with prejudice because his procedural default is unexcused. Id. at 1139.

**IV. Certificate of Appealability**

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. The standard for a certificate of appealability is not intended to be high. Coluccio has made a showing with some substance to it that he was deprived of a constitutional right because the trial court's instruction on negligence materially diminished or negated the prosecution's burden of proof on that element. 28 U.S.C. § 2253(c)(2). The merits of that claim have not been reached, because Coluccio did not invoke federal rights in any manner in state court. Although this Court has no doubt that both claims of the petition are procedurally defaulted, an issue "can be debatable even though every jurist of reason might agree, after the COA has been

granted and the case has received full consideration, that petitioner will not prevail." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003). Coluccio points to a question the Supreme Court has acknowledged is open. Though he stands several yards away from the opening, he is close enough to compare favorably with other cases in which the Court of Appeals has granted a COA. A certificate will be granted on the questions of whether Coluccio's claims are procedurally defaulted and whether he can meet the Schlup standard to excuse any default.

Based on the foregoing, the Court enters the following:

**ORDER**

1. The State's motion to dismiss (doc. 17) is GRANTED.

2. The Amended Petition (doc. 14) is DISMISSED WITH PREJUDICE as procedurally defaulted without excuse.

3. The Clerk of Court shall enter by separate document a judgment in favor of Respondents and against Petitioner.

4. A certificate of appealability is GRANTED on the issues of whether Coluccio's claims are procedurally defaulted and whether he can meet the Schlup standard to excuse any default.

DATED this 8th day of February, 2011.

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge